In re Gary L. BRADLEY, Debtor.

Ronald Ingalls, Trustee, Plaintiff,

v.

Gary L. Bradley, Defendant.

Bradley Beutel, Trustee of and on Behalf of the Lazarus Exempt Trust, Plaintiff,

v.

Ronald E. Ingalls, Chapter 7 Trustee, Defendant.

Federal Deposit Insurance Corp. as Manager of the FSLIC Resolution Fund, Plaintiff,

v.

Gary L. Bradley, Defendant.

Bankruptcy No. 02–12741–FM. Adversary Nos. 02–1183–FM, 02–1205–FM, 03–1037–FM.

United States Bankruptcy Court, W.D. Texas, Austin Division.

July 19, 2007.

Eric J. Taube, Mark Curtis Taylor, Hohmann, Taube & Summers, L.L.P., Austin, TX, for Bradley Beutel, Trustee of and on Behalf of The Lazaurs Exempt Trust.

Frank N. Ikard, Jr., Mary Haught, Ikard & Golden, P.C., Patrick C. Hargadon, Bankston & Richardson, L.L.P., Austin, TX, for Ronald E. Ingalls.

Herbert W. Linder, U.S. Department of Justice, Tax Division, Dallas, TX, for Internal Revenue Service.

Elizabeth Grace Smith, Law Offices of Elizabeth G. Smith, San Antonio, TX, for FDIC, Manager FSLIC Resolution Fund.

Raymond W. Battaglia, San Antonio, TX, Stephen A. Roberts, Strasburger &

Price, LLP, Austin, TX, for Gary L. Bradley.

## *MEMORANDUM OPINION*

FRANK R. MONROE, Bankruptcy Judge.

█ The Court held a hearing on the First Amended Joint Motion of United States, Chapter 7 Trustee and FDIC ("Plaintiffs/Movants" herein) for Contempt Against Brad Beutel and/or Tommy Thompson and Request for Sanctions ("Sanctions Motion") on March 28, 2007. This is a core proceeding since the issue is whether, and to what extent, Brad Beutel and/or Tommy Thompson willingly violated injunctive orders of this Court entered in this adversary proceeding against either of them. The Sanctions Motion arises in a case under Title 11 and is a core proceeding under 28 U.S.C. § 157(b)(1) and (2). This Court has the jurisdiction to enter a final order herein under 28 U.S.C. § 157(a) and (b), 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 151 and the Standing Order of Reference of all bankruptcy matters to this Court by the United States District Court for the Western District of Texas.

### *Facts*

This Court held a trial on the merits in the above adversary proceeding on April 19, 2004, 343 docket entries into the case. On October 28, 2004, this Court entered its 145–page Memorandum Opinion and its Judgment resulting from the trial as docket entries # 411 and # 412 respectively. The Court's ruling in general can be summed up in the following statement, "For those of us looking in, this is an incredibly fraudulent scheme engaged in primarily by Gary Bradley, the Debtor, Gressett, the Debtor's business partner, and, with the Trust's formation, Bradley Beutel, the Trustee, as well, to hide the assets Bradley owned, to place them into the Trust when formed and to preserve them from the clutches of Bradley's creditors, the FDIC and the IRS." *Memorandum Opinion* at page 139.

Throughout the pendency of this adversary proceeding, Plaintiffs did not trust the Defendants and were fearful that during the pendency of the case, Defendants would do whatever they could to strip assets out of the Trust. On November 5, 2003, the Trustee filed his Application for Equitable and/or Injunctive Relief ("Application") which accused Beutel of all manner of self-dealing out of the Trust and sought an order enjoining the same as well as requiring substantial reporting with regard to Trust assets, not only to Gary Bradley, but to Ingalls as the bankruptcy trustee as well. A hearing was held on January 7, 2004. The Order entered on January 12, 2004 granted the Trustee's Application in the following respect:

ORDERED that the Chapter 7 Trustee's Application for Equitable and/or Injunctive Relief be, and the same is hereby, granted as to Bradley Beutel as Trustee of the Lazarus Exempt Trust such that pending trial of the causes of action by and between Ronald Ingalls, Trustee, and Bradley Beutel, Trustee, and on behalf of the Lazarus Exempt Trust, that Bradley Beutel as Trustee of the Lazarus Exempt Trust be, and he is hereby, enjoined from transferring property or money of the Trust to himself or to any entity either controlled by him or in which he owns an interest or to any entity represented by Donald W. Holcomb as announced on record by Mr. Holcomb at the commencement of the hearing of this Application. Notice in open Court of the issuance of this injunction on January 8, 2004 at the hearing attended by Mr. Holcomb is sufficient notice to all parties he represents; it is further

ORDERED that should Bradley Beutel, as Trustee of and on behalf of the Lazarus Exempt Trust, want relief from this injunction, he must file the appropriate pleadings showing the appropriate cause.

On February 18, 2004, Bradley Beutel filed a Motion to Approve Certain Transactions and Payments pursuant to the above cited Order seeking repayment of two loans he had personally made to Lazarus Investments, L.P. on April 27, 2003, one in the amount of $100,000.00 and the other in the amount of $200,000.00. Such Motion also sought payment of $6,000.00 to Beutel Capital Management, L.L.C. as well as management fees allegedly owed by Phoenix Holdings, Ltd. to Beutel Capital Management in the amount of $47,500.00 a month and reimbursement of some wage and payroll advances in the amount of $7,493.68 that Beutel Capital Management had made for Lazarus Investments. The Plaintiff opposed that Motion and a hearing was held on March 10, 2004. Two Orders were entered. The Interim Order dated July 21, 2004 authorized the payment of $6,000.00 to Beutel Capital Management and authorized the payment of management fees to Beutel Capital Management for the period of March 2004 and thereafter. Also on that date, the Court entered its Order authorizing the repayment to Mr. Beutel individually of the $100,000.00 and $200,000.00 loans but only to the extent that funds remained from the original transaction for which the loans were made.

On July 30, 2004, Plaintiffs filed their Joint Motion to Maintain Status Quo Pending Final Ruling In Adversary Proceeding, or in the Alternative, to Extend the Court's Sua Sponte Temporary Injunction. In this pleading, Plaintiffs were fearful that Bradley Beutel as Trustee of the Lazarus Exempt Trust or other entities associated with him would sell, transfer, or otherwise alienate assets of the Trust pending final ruling of the adversary proceeding thereby defeating as a practical matter any potential recovery that the Plaintiffs might obtain as a result of the trial of the merits. A hearing was held on August 24, 2004 upon such Joint Motion. At that hearing it was disclosed by Mr. Beutel's counsel that there was an existing contract for sale of most of the real property owned by Phoenix Holdings, a Trust entity that the Court later in its Memorandum Opinion of October 28, 2004 determined to be a self-settled portion of the Trust and, therefore, property of Gary Bradley's bankruptcy estate. This disclosure was made at the end of the hearing and, to the Court's knowledge, was the first time it was ever disclosed to anyone outside the Trust. A review of the transcript of that hearing reflects that beginning at page 36, the Court voiced its concern that Beutel might cause Phoenix Holdings to sell some of its properties, realize significant sums of cash over and above what was necessary to pay the debt against the property, and then disburse the remainder of the money throughout the Trust into various other entities making it hard if not impossible to trace thereby leaving the Plaintiffs without an effective remedy even if they were the victors in the lawsuit. So, at page 38 in the transcript, the Court ruled it was entering an injunction to

"Enjoin Mr. Beutel as trustee from disposing of any asset owned by any entity in which the trust owns at least 51 percent of the equity or which it controls except that the trustee may sell, through his control of any of those entities, any asset of those entities if the sale is for a fair value and at arm's length and provided further that the consideration therefore be maintained in that entity except for the payment of valid, non-

insider claims of those entities and shall not be disbursed to other entities in which the trust owns an interest, to the trustee, to the beneficiary of the trust, to any entity represented by Mr. Holcomb ... or to Mr. Gressett or to any insider of such parties. That would include Mr. Bradley's sister ...".

It was only after the injunction was imposed that Mr. Beutel's lawyer disclosed the existence of the pending contract of sale of Phoenix Holdings' real estate.

In this context it cannot be seriously contended that a specific injunction against Mr. Beutel as Trustee of the Lazarus Exempt Trust was not issued orally on the record in very specific terms. Everyone in the courtroom understood that the Court had orally issued an injunction which the attorneys were then to put in written form. No one who was there, basically the same lawyers who are involved in prosecuting and/or defending the Sanctions Motion, should be allowed to take the position that the Court's ruling on August 24, 2004 was not intended to be effective immediately nor that Mr. Beutel was somehow exempt from the ruling because he chose not to attend the hearing. His lawyer was there and adequately represented his interest. Beutel claims his lawyer did not tell him the outcome of the hearing, he never called his lawyer to find out, and he did not become aware of the injunction until he got a copy of the written Order on September 27, 2004 [which was signed on September 20, 2004]. These statements Mr. Beutel made under oath while testifying at the hearing on the Sanctions Motion. The fact is that the pending sale of Phoenix Holdings' real estate was very important to Beutel and the Trust as they very much needed the money from the sale. He had been working on the sale for months. He knew his adversaries were asking this Court to issue an injunction that would

interfere with the sale and his use of the proceeds to be derived therefrom, but he chose not to come to the hearing.

Additionally, on September 10, 2004, Mr. Beutel caused his counsel to file a Motion to Approve Certain Transactions and Payments ("September 10 Motion") in which Beutel made the following admission:

"1. As the Court is aware, Mr. Beutel is the trustee of the Lazarus Exempt Trust. This Court has previously entered orders requiring that, prior to any payments being made between related entities, Mr. Beutel should approach this Court for approval of such transactions."

The only Order that required Court approval prior to making payments between related entities was the injunction orally issued on the record on August 24, 2004 and documented by the written Order actually signed September 20, 2004. The January 12, 2004 injunction specifically allowed payments between related entities. The remainder of the September 10 Motion sought authority to disburse virtually 100 percent of the proceeds of the sale of the real estate received September 7, 2004. The September 10 Motion simply would not have been filed and the above admission contained therein would not have been made if Beutel knew nothing of this Court's injunction of August 24, 2004. There are only two conclusions that can be reached. Mr. Beutel's testimony on this point is either an error of memory or perjury. This Court does not believe Mr. Beutel's testimony that he knew nothing about the injunction until September 27, 2004 in any manner, shape or form. Mr. Beutel's attempt to use the "ostrich with his head stuck in the sand" defense is not only implausible, it is patently ridiculous. His testimony cannot be believed, and the Court no longer holds any faith in Mr. Beutel's ability or desire to be truthful. He is the epitome of the non-credible wit-

ness. And, it is obvious that he chose not to attend the August 24th hearing so he would not have to testify about the pending sale.

The reason that the above analysis is important is because on September 7, 2004 Mr. Beutel closed the sale of real property owned by Phoenix Holdings that was first acknowledged by his counsel after the ruling which imposed the injunction against him at the August 24, 2004 hearing. Total consideration was $22,070,959.00. Earnest money paid to Phoenix Holdings prior to August 24, 2004 totaled $1,000,000.00. An additional $500,000 of earnest money was received on August 31, 2004. The sale netted $6,557,342.15 to Phoenix Holdings, Ltd. on September 7, 2004.

Movants claim that Beutel disbursed monies received from the sale of Phoenix Holdings' real estate in violation of this Court's Order Granting in Part and Denying in Part Chapter 7 Trustee's Application for Equitable or Injunctive Relief entered January 12, 2004 and the Order Extending and Modifying Interim Injunction signed September 20, 2004 which put in writing the oral injunction issued in open court on August 24, 2004 and extended the January 12, 2004 Order to ten days after entry by this Court of its Judgment in the adversary proceeding.[1]

### Controlling Law

■ "It is firmly established that in a civil contempt proceeding, the parties seeking an order of contempt need only establish by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Piggly Wiggly Clarksville, Inc., v. Mrs. Baird's Bakeries,* 177 F.3d 380, 382 (5th Cir.1999) (citing *F.D.I.C. v. LeGrand,* 43 F.3d 163, 170 (5th Cir.1995)) (citing *Martin v. Trinity Industries, Inc.,* 959 F.2d 45, 47 (5th Cir.1992)).

■ "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford,* 68 F.3d 958, 961 (5th Cir.1995) (quoting *Securities and Exchange Commission v. First Financial Group of Texas, Inc.,* 659 F.2d 660, 669 (5th Cir.1981)).

■ "The judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt was founded is vague or ambiguous." *Martin,* 959 F.2d at 47 (quoting *Baddock v. Villard (Matter of Baum),* 606 F.2d 592, 593 (5th Cir.1979)).

That being said, the issue at hand is the extent to which an oral injunction stated on the record in clear and unequivocal language can be enforced by contempt against action taken by the person to whom the injunction was directed with actual knowledge of said oral injunction and taken between the time the oral injunction was pronounced on the record and the entry of the said injunction in written form.

The Court's research leads it to believe that the granting of civil contempt sanctions based on an oral order would be the

---

1. The Chapter 7 Trustee's Application for Equitable and/or Injunctive Relief filed November 5, 2003 was granted as to Bradley Beutel as Trustee for the Lazarus Exempt Trust *"pending trial* of the causes of action by and between Ron Ingalls, Trustee, and Bradley Beutel, Trustee and on behalf of the Lazarus Exempt Trust". Therefore, the January 12, 2004 Order expired by its own terms at the conclusion of the trial of the merits, approximately April 30, 2004. Accordingly, from April 30, 2004 until August 24, 2004, no injunction was in place.

exception and not the rule. Beutel cites the Court to *Bates v. Johnson,* 901 F.2d 1424 (7th Cir.1990) in support of his proposition that this Court's oral injunction cannot be enforced by contempt against him. That case is factually far different from this case. In that case, the district court was considering the State of Illinois' decree to allow parental visits on a weekly basis with children that had been removed from their homes. The district court pronounced what appeared to be an oral injunction on more than one occasion. The State asked that the district court enter it in written form so that it could be appealed. However, the district judge failed to either hold a hearing or enter any further written order. The 7th Circuit opined, *"Like the state, we are puzzled by the district judge's unwillingness to put on paper what he said several times in court. Oral statements are not injunctions. A judge who proclaims 'I enjoin you' and does not follow up with an injunction has done nothing."* (cites omitted). Unlike the district court in the *Bates* case, this Court made a specific injunction on the record that was clear and unambiguous and followed it up with a written Order.

Beutel also cites *Landmark Legal Foundation v. Environmental Protection Agency,* 272 F.Supp.2d 70 (D.D.C.2003) which cited the *Bates* case favorably. However, the real reason the court ruled the way it did is found in this sentence, "Reliance on a non-attorney two-week employee to immediately grasp the significance of the court's statement and communicate the order to the entire EPA is a slender reed indeed." *Landmark Legal Foundation* at 80.

As with federal courts, the courts of the State of Texas have a strong policy against imprisoning people for disobeying an oral injunction although there are exceptions. Take *Ex parte Barnes,* 581 S.W.2d 812,

(Tex.Civ.App.-Ft. Worth 1979) where the court opined as follows: "An oral order of temporary injunction is just as effective as the signing of a written order. However, it is the well settled rule regarding contempt that the order or injunction which is violated must be clear and sufficiently specific to give the actor notice that he is to do or refrain from doing a given act. Therefore, it follows that an oral order of injunction to be enforceable by contempt must be just as clear and specific as a written order of an injunction." *Barnes* at 814. The Court of Civil Appeals in Waco opined the opposite. Citing the Texas Supreme Court case *Ex Parte Price,* 741 S.W.2d 366 (Tex.1987), the court opined that "violations of an oral order are not subject to constructive contempt punishment." *Ex Parte Waldrep,* 932 S.W.2d 739, 741 (Tex.App.-Waco, 1996). The dissent in the *Waldrep* case stated, "I would further hold that when an unambiguous, specific oral order is preserved in the record, and the party charged with contempt had actual notice of the order, the court can enforce it by contempt proceedings for a reasonable time until a written order can be signed." *Ex Parte Waldrep* at 742.

 So the question before the Court is whether Beutel as the representative of the Trust should be held in civil contempt of this Court's oral injunction placed on the record August 24, 2004 and such liability passed on vicariously to the current Trustee, Tommy Thompson, so that remaining Trust assets, if any, are liable for Mr. Beutel's contemptuous behavior as Trustee of the Lazarus Exempt Trust.

The answer of the Court is yes for the following reasons:

1. This is a civil contempt issue not a criminal contempt issue. No imprisonment is involved.

2. Beutel had actual knowledge of the Court's oral injunction stated on the record August 24, 2004.

3. The August 24, 2004 oral injunction was clear and specific.

4. It was only after the injunction was pronounced on the record that Beutel's counsel disclosed the existence of the pending sale.

5. The remainder of the hearing was devoted primarily to Beutel's counsel clarifying the exact extent of the injunction orally pronounced on the record; approximately one-quarter of the total time of the hearing.

6. The sale in question had been Beutel's primary focus from the end of the trial on the merits-April 30, 2004–until the date of the injunction hearing.

7. Beutel did not come to the hearing-obviously so he could avoid being put on the stand and potentially have to testify about the pending sale.

8. The sale was of a great portion of real estate owned by the Trust through two of its entities and would result in substantial cash being generated which Beutel needed.

9. Beutel believed he was restrained by the oral injunction of August 24th. His September 10, 2004 Motion stated unequivocally the existence of this Court's injunction which required him to obtain this Court's approval before making payments to related entities. *THE ONLY SUCH ORDER IN EXISTENCE AS OF THAT DATE WAS THE ORAL INJUNCTION OF AUGUST 24, 2004.*

10. Beutel's counsel was to draft the written order. It was a relatively simple order. Yet it was not submitted to this Court for entry until September 20, 2004, approximately four weeks after the August 24, 2004 hearing and two weeks after Beu-

tel's counsel filed the September 10, 2004 Motion to approve disbursements of the remaining sales proceeds. Why was the September 10 Motion filed if Beutel and his counsel did not believe the injunction was in place?

11. The September 10, 2004 Motion to Approve Certain Transactions and Payments from the sales proceeds is a judicial admission as to the existence of the August 24, 2004 injunction and its validity. Otherwise, there would be no reason for counsel to have filed the Motion.

12. Beutel's wanton contemptuous behavior should neither be condoned nor encouraged.

13. Courts should be able to rely upon a party's counsel and their duty to the courts.

Exhibit G to the Sanctions Motion details twenty-nine disbursements by Beutel which Movants allege were from the proceeds from the sale of Phoenix Holdings' real estate in violation of this Court's injunction. The first twelve were made during the time period after the end of the trial on the merits on April 30, 2004 and before the August 24, 2004 injunction hearing. They were accordingly made when no injunction was in place. And, even if the January 12, 2004 Order could be viewed in effect, the disbursements made in items 1 through 12 were not made to Beutel or any of his family members or to any entity owned or controlled by Mr. Holcomb's clients.

 Much of the testimony and argument at the trial of the Sanctions Motion centered upon whether or not Beutel had disbursed earnest money received from the buyers under the pending real estate sale in the amount of $1.5 million in violation of this Court's injunction. One of Beutel's defenses was that this was not earnest money that he was disbursing: it

was "extension fees". However, the relevant documents in evidence do not have the words "extension fees" anywhere in them. This is simply another attempt by Beutel to mischaracterize the truth in the hope of being able to get away with something he should not have been doing in the first place. Although his actions in disbursing the earnest money received prior to August 24, 2004 did not violate any injunction of this Court, it was clearly an improper act since if the sale had not closed, Phoenix Holdings would not have been able to repay the proposed purchaser the earnest money. Beutel testified that the "earnest money/extension fees" were money that under the contract he was not restricted from expending. However, under the Real Estate Sales Contract originally executed on May 13, 2004, $500,000.00 of the earnest money was to be deposited with the title company. Apparently, that occurred. Under the First Amendment to the Real Estate Contract, the title company was authorized to release that earnest money and the deposit became non-refundable in all events "except in the event Purchaser terminates the Contract due to (i) Seller's failure to close as is required under the Contract or (ii) the appearance of any new exception on a subsequent commitment that relates to any bankruptcy, litigation, or creditor's right issue or matter that Seller cannot cause to be removed as a title exception at or prior to closing." Obviously under the First Amendment, Beutel's right to use the earnest money deposit was not completely unfettered as he maintains. Under the Second Amendment to Real Estate Sales Contract, the closing date was extended, *but no additional earnest money was deposited.* If the earnest money were truly an extension fee as Beutel maintains, one would wonder why there is no money paid with the extension under the Second Amendment. Under the Third Amendment to Real Estate Sales Contract, additional earnest money of $500,000.00 was to be paid to the title company no later than August 18, 2004. This additional earnest money was to be applied against the purchase price unless it was not received by August 31, 2004. It was actually received by Phoenix Holdings and deposited on August 19, 2004. There is nothing in the Third Amendment that would give Beutel the right to use these monies without restriction. Additionally under the Third Amendment, there was an option payment of $250,000.00 which, in fact, was non-refundable. The Fourth Amendment to Real Estate Sales Contract required an additional $500,000.00 in earnest money to be delivered to the title company by August 31, 2004 and to be received by the Seller no later than September 3, 2004 or it would be retained without claim or liability to the Purchaser. If it was received by that date, it would be applied to the purchase price. It was, in fact, received by Phoenix Holdings on August 31, 2004. There is nothing in the Fourth Amendment that gives Beutel the right to use those monies for any reason he desires and without obligation to repay since they were timely received. Beutel's testimony regarding his ability to use the earnest money under the Real Estate Sales Contract in a manner not authorized by that contract or any amendment thereto simply shows his disregard for the contractual obligations imposed upon him.

■ Movants claim that the injunction issued at the August 24, 2004 hearing and the Order signed September 20, 2004 memorializing the same extended the January 12, 2004 injunction. While that is what the Order says, it can only be effective from the date of the ruling on August 24, 2004 forward. It cannot have the legal effect of retroactively resurrecting and reimposing the January 12, 2004 injunction which by

its own terms expired at the end of the trial, April 30, 2004. Such retroactive effect would make actions taken when no injunction existed contemptuous simply because of the perceived retroactive effect of the September 20, 2004 Order. It would put Mr. Beutel in a situation of being judged guilty of contempt of this Court's Order even though his actions between April 30, 2004 and August 24, 2004 were actually taken when no injunction was in effect. The Court does not believe that someone can be held in contempt of an injunction on the basis of a perceived retroactive effect. An injunction can only be violated to the extent it is in existence when the actions complained of took place. It cannot reach back.

As to the disbursements set out in Exhibit G to the Sanctions Motion as items 13 through 29, the Court has no alternative but to address them one by one.

With respect to the disbursements on August 25, 2004 and August 26, 2004—items 13, 14, 15 and 16 totaling $26,-950.00—such disbursements did not violate the January 12, 2004 Order as clarified by the Court's letter of March 23, 2004. Transfers between Trust entities were specifically allowable under that Order. The Court's injunction on August 24, 2004 as set forth in the Court's Order signed September 20, 2004 did prohibit intra-Trust transfers but only with regard to proceeds received from the disposition of assets. These four disbursements do not appear to be a disbursement of proceeds of sales but rather disbursements of capital recovery fees which were deposited into the account on August 25, 2004. As such they were not violations of this Court's injunction of August 24, 2004. After these disbursements were made, Phoenix Holdings had only $693.31 in the bank.

On August 31, 2004, Phoenix Holdings received $500,000.00 additional earnest money from its pending sale of real estate. On September 2, 2004, Phoenix Holdings received mitigation fees totaling $70,200.00. On September 7, 2004, Phoenix Holdings received $6,557,342.15 in proceeds from the sale of its real estate.

Disbursement item 17—$3,000.00 to Castle Realty Management, item 18—$16,750.00 to Lazarus Exempt Trust, and item 19—$21,000.00 to Lazarus Investments were made on September 2, 2004. All are Trust related entities. These disbursements total $40,750.00. Movants claim this was an unauthorized disbursement of proceeds of sale, i.e. the $500,000.00 in earnest money received August 31, 2004. Mr. Beutel argues this was payment out of $70,200.00 in mitigation fees received September 2, 2004. If Beutel's position is adopted, then after these payments were made there remained in the Phoenix Holding account only $29,450.00 attributable to mitigation fees.[2] However, there were four more disbursements on that date about which Movants have not complained. They too should be attributed to and deducted from the mitigation fees. These are check No. 1420 to Williams Scotsman(sic) in the amount of $1,214.84, check No. 1421 to William C. Love, CPA, in the amount of $374.60, check No. 1422 to William C. Love, CPA, in the amount of $1,938.20, and check No. 1426 to Beutel Capital Management in the amount of $20,000.00. This leaves only $5,922.36 in the account attributable to mitigation fees.

As related above on September 7, 2004, proceeds of $6,557,342.15 were received from the sale of the land. That amount, combined with the $500,000.00 earnest

---

**2.** Although cash is fungible, the Court will accept Beutel's allocation in this instance as it is verifiable by the business records of Phoenix Holdings.

money received August 31, 2007 resulted in total proceeds from the sale of the real estate that existed in the account of Phoenix Holdings on September 7, 2004 of $7,057,342.15. The only other funds in the account were the balance that existed as of August 26, 2004 of $693.31 and the remaining balance of mitigation fees of $5,922.36, making the total non-sales proceeds in the account as of September 7, 2004, only $6,615.67. Check No. 1439 on September 8, 2004 to Robertson Smith was in the amount of $4,450.00. Deducting this from the non-sales proceeds leaves only $2,165.67 of non-sales proceeds in the account as of September 8, 2004.

Beutel then proceeded to disburse the funds received from the sale beginning September 9, 2004, one day before he filed his Motion to Approve Certain (Other) Transactions and Payments on September 10, 2004. It is puzzling why Mr. Beutel thought that the disbursements made by him on September 9, 2004 needed no Court approval but those proposed in his Motion filed September 10, 2004 did. After all, he acknowledged in the Motion that the Court had "previously entered Orders requiring that, prior to any payments being made between related entities, Mr. Beutel should approach this Court for approval of such transactions." And as we shall see, the majority of the payments made on September 9, 2004 and following were in fact made to related entities.

Those complained of by Movants are item 21—$20,929.00 to The Bartlett Group, an entity in which the Trust owned 49 percent and which it controlled; item 22—$32,550.00 to Castle Realty Management, a Trust-owned entity; item 23–$75,000.00 to Beutel Capital Management, an insider of Beutel since it was an entity owned by him

and his children's trusts and one which he solely controlled; item 24—$2,405,169.00 to Lazarus Investments purportedly as its share of the sales proceeds and clearly a Trust entity; and item 25—$50,000.00 to the Golf Club at Circle C, L.P., an entity identified as being represented by Don Holcomb in the January 12, 2004 injunction which had been extended at the August 24 hearing. The checks were actually written in the following sequence on September 9, 2004: Check No. 1427, Lazarus Investments, $2,405,169.00, Check No. 1428, Beutel Capital Management, $75,000.00, Check No. 1429, Castle Realty Management, $32,550.00, Check No. 1430, The Bartlett Group, $20,929.50 and on September 10, 2004 Check No. 1432, the Golf Club at Circle C, $50,000.00.

From September 8, 2004 forward there is nothing in the account but sales proceeds and $2,165.77 of non-sales proceeds until a deposit of $16,200.00 is made on September 22, 2004. Accordingly, Movants have proven that the disbursements on September 9, 2004 to Lazarus Investments of $2,405,169.00 [3] (item 24), to Beutel Capital Management of $75,000.00 (item 23), to Castle Realty Management of $32,550.00 (item 22), to The Bartlett Group of $20,929.50 (item 21), and the additional complained of payment of $9,000.00 to Lazarus Investments on September 21, 2004 (item 27) were clearly all made from sales proceeds. The Court does not consider the payment to Lazarus Investments of $2,405,169.00 to be in violation of the injunction, but see discussion below. The $2,165.67 remaining of non-sales proceeds as of September 9, 2004 will be applied to the Beutel Capital Management payment of $75,000.00 leaving $72,834.33 which was paid with sales proceeds. The question

---

**3.** Of this amount, $468,535.16 was returned to Phoenix Holdings by Lazarus Investments as a reimbursement of over-paid proceeds from sale which it had received from Phoenix Holdings. The net amount disbursed to Lazarus Investment was then $1,936,633.90.

remaining is whether such payments made by Mr. Beutel with full knowledge of the August 24, 2004 injunction violated that injunction.

Item 24 was a disbursement to Lazarus Investments of sales proceeds for its real estate which was sold under the Real Estate Sales Contract in the amount of $2,405,169.00. As previously noted, $468,535.16 was refunded by Lazarus Investments to Phoenix Holdings as it was determined by Beutel to have been an overpayment. The net amount disbursed to Lazarus Investments was $1,936,633.90. The initial disbursement occurred on September 9, 2004. The refund occurred on September 10, 2004, the very same day that Beutel caused his counsel to file the Motion to Approve Certain Transactions and Payments with regard to the remaining funds from the sale of the real estate. Once again, Beutel knew that he had to have Court authority to disburse funds because the Court had enjoined him from doing so on August 24 as explicitly acknowledged in his September 10, 2004 Motion to Approve. The question remains why he did not include these transactions in his Motion as opposed to just simply doing them. Once again, we see Mr. Beutel's disregard for the rule of law.

Nevertheless, it appears without contest that the Real Estate Sales Contract included the sale of property both owned by Phoenix Holdings and Lazarus Investments. Therefore, a disbursement by Beutel from Phoenix Holdings to Lazarus Investments of Lazarus Investments' portion of the sales proceeds, even if in violation of the injunction, should not be sanctionable in the full amount of the proceeds disbursed because Lazarus Investments was entitled to receive its share of the sales proceeds even if Beutel did not ask like he knew he needed to.

There is a problem with the disbursement, however. Beutel testified that he allocated the sales proceeds by dividing the total consideration received from the sale of all of the real estate by the total number of acres being sold, with the per acre price being multiplied by the number of acres each entity owned. That seems entirely reasonable. But then Beutel resorts to trickery. He does not assess any of the closing costs to Lazarus Investments. Why? Obviously, Lazarus Investments needed the money. The closing costs which should have been allocated pro rata between the two entities are as follows:

| | |
|---|---|
| 2004 Property Tax | $ 99,087.50 |
| Commission | 1,140,000.00 |
| Survey | 77,037.38 |
| Legal Fees | 34,000.00 |
| 2003 Taxes—DR | 42,391.17 |
| 2003 Taxes—Hayes | 229.53 |
| Title Insurance | 80,168.00 |
| Escrow Fee | 500.00 |
| Courier Fees | 100.00 |
| Tax Certificates | 241.90 |
| Policy Guaranty Fee | 1.00 |
| Attorney | 250.00 |
| Recordation Fee | 100.00 |
| Total | $1,474,106.30 |

Phoenix Holdings sold 973 acres. Lazarus Investments sold 119 acres. Lazarus' percentage of the total acreage sold was 10.89743 percent. Accordingly, Lazarus Investments' portion of the closing costs which it should have paid but for Beutel's maneuvering was $160,639.70. The Court finds that Beutel, with the specific intent to avoid the effects of the August 24, 2004 injunction, of which he was well aware, made this allocation so that $160,639.70 that should have been in Phoenix Holdings' bank account ended up in Lazarus Investments' bank account. This was a clear transfer of proceeds of the sale of Phoenix Holdings' property by Beutel to another entity owned by the Trust with knowledge of and in violation of the August 24 injunction.

Item 21 was a payment to The Bartlett Group of $20,929.50 on September 9, 2004. Mr. Beutel's defense is that the payment was made from capital recovery fees and was permitted by the January 12, 2004 Order as The Bartlett Group was owned by the Trust. However, no non-sales proceeds remained. And, the August 2004 injunction clearly prohibited the transaction as discussed in detail above. Beutel knew of the injunction and knowingly made the disbursement anyway. This disbursement was in violation of the injunction.

Item 22 was a payment to Castle Realty Management of $32,550.00 on September 9, 2004. Mr. Beutel's defense is that the payment was made from capital recovery fees and was permitted by the January 12, 2004 Order as Castle Realty Management was owned by the Trust. Again, no non-sales proceeds remained. And, the August 2004 injunction prohibited the transaction as discussed in detail above. Beutel knew of the injunction and knowingly made the disbursement anyway. This disbursement was in violation of the injunction.

Item 23 was a payment to Beutel Capital Management of $75,000.00 on September 9, 2004 but reduced by the use of non-sale proceeds of $2,165.67 to $72,834.33. Beutel alleges this was for payment of management fees authorized by the July 21, 2004 Order. However, Beutel Capital Management is obviously an insider of Beutel since it was an entity owned by him and his children's trusts which he controlled. It was a disbursement specifically prohibited by the August 24, 2004 injunction which had obviously superseded the July 21, 2004 Order. By this disbursement of $72,834.33 Beutel violated the injunction

Item 25 is the $50,000.00 disbursement to the Golf Club at Circle C. Mr. Beutel testified that the Movants have in-

correctly identified the entity to which the payment was made. He states that the payment was not made to the Golf Club at Circle C, L.P. but to a new entity, The Golf Club at Circle C, L.P., which was the entity which had acquired the golf course late 2002 or early 2003. It is the Movants' burden to show by clear and convincing evidence that this was in violation of the Court's injunction. Accordingly, it is the Movants' burden to show that these proceeds were knowingly transferred by Beutel to an entity in "which the trust owns an interest, to the trustee, to the beneficiary of the trust, or to any entity represented by Mr. Holcomb … or to Mr. Gressett or to any insider of such parties". Beutel's testimony is that the entity the "Golf Club at Circle C, L.P.", which was represented by Mr. Holcomb was not the same entity to which he made this disbursement. That entity was a different entity—"The Golf Club at Circle C, L.P.". While the distinction at first glance seems to be patently ridiculous, Mr. Beutel identified a transaction in which the golf club property had allegedly been purchased by a Mr. Deroeck and put into the new entity which had the same name as the old entity except the word "The" in the title now had a capital "T". He also identified the lawyer who represented Mr. Deroeck in the transaction as well as identifying what the payment was for. "There was a building of the retention pond and you had several property owners where rainwater would flood into this pond. And in order for the golf course basically to cooperate—I mean they got some benefit in that they could use the rainwater but in order to have the drainage easements across the golf course, we paid them." Due to the specificity of Mr. Beutel's response which could easily have been checked out and refuted, if untrue, the Court finds that Movant has failed in his burden to show that this was a

transfer that violated the Court's injunction as it has not been clearly proven that this was an entity owned by the Trust.

Item 26 is a $2,500.00 loan from Lazarus Investments to Slaughter 100, Ltd., a Trust related entity, to allow payment of a property tax installment. Beutel caused Lazarus Investments to make this payment on September 20, 2004 with the money it received from its portion of the sales proceeds. He violated the August 24 Injunction in doing so.

Item 27 is a payment of $9,000.00 to Lazarus Investments on September 21, 2004. Mr. Beutel's defense appears to be that the $9,000.00 payment was for September rent and it was paid out of capital recovery fees. The fact that it may have been for rent is irrelevant. Lazarus Investments was an entity owned by the Trust. And, as demonstrated above, it was made with proceeds of the sale of real estate which Beutel knowingly made. This is a clear violation of the injunction.

Item 28 is a payment by Phoenix Holdings of $9,500.00 to Castle Realty Management on September 24, 2004 for management fees. Phoenix received additional capital recovery fees of $16,200.00 on September 22, 2004. There were two other payments made after September 22, 2004 prior to the payment to Castle Realty Management; however, the $16,200.00 was sufficient to cover all these payments. Therefore, this payment did not violate the injunction.

Item 29 is a payment of $19,500.00 from Lazarus Investments to Strategic Land Management, another related Trust entity made on September 19, 2004. This was a loan for payment of legal fees. Beutel testified at trial that this payment had actually never been made and had been voided. However, both Plaintiffs' and Defendant's Exhibits reflect that Lazarus Investments made this payment from its

share of the sales proceeds it received from Phoenix. See Plaintiffs' Exhibit 19 and Defendant's Exhibit 4. Nowhere in these exhibits or any exhibit does it show that this payment was voided. Once again the documents speak volumes. It is clear that Beutel caused Lazarus Investments to make this payment on September 21, 2004 with the money it received from its portion of the sales proceeds. Such payment violated the August 24 Injunction.

The total amount paid out by Beutel in violation of the court ordered injunction is $317,953.53 (item 20—$160,639.70 of closing costs that should have been apportioned to Lazarus Investments, item 21—$20,929.50 paid to The Bartlett Group, item 22—$32,550.00 paid to Castle Realty Management, item 23—$72,834.33 paid to Beutel Capital Management, item 26—$2,500.00 paid to Slaughter 100, Ltd. and item 27—$9,000.00 paid to Lazarus Investments and item 29—$19,500.00 paid to Strategic Land Management).

Movants request that this Court hold Brad Beutel in contempt of this Court's August 24th injunction and that the Court impose such sanctions that, in its discretion, it may deem appropriate. Movants specifically ask this Court to order Beutel to return and/or pay over to the Chapter 7 Trustee an amount of money equal to the total of all transfers found to be contemptuous or, in the alternative, that this Court enter judgment in their favor against Tommy Thompson, the current Trustee of the Lazarus Exempt Trust, for such amount. The Court entered an Order on October 2, 2006 joining Tommy Thompson, as Trustee of the Lazarus Exempt Trust, in this proceeding.

Movants also allege that Tommy Thompson is somehow complicit in Beutel's behavior citing § 114.002 of the Texas Property Code for the proposition that he should be personally liable for Beutel's actions as well. Section 114.002 is a trust

provision that provides that a successor trustee can be liable for his predecessor's breach if he either knew or should know of a situation constituting a breach of trust committed by the predecessor, and the successor trustee fails to take certain actions to correct such breach.

The parties stipulated at trial that Thompson did not object to Beutel's actions once he succeeded Beutel as Trustee months after the challenged transactions occurred. That is, however, insufficient to establish Thompson's participation in any act of contempt. There is simply no basis for a contempt finding against Thompson personally.

■ Movants also request that this Court order any entity holding funds paid in violation of the injunction to turn over those funds to the Chapter 7 Trustee; however, Movants have failed to name any of these entities as respondents herein or to otherwise pursue them. As such, this Court cannot address Movants request for turnover against them.

■ Bankruptcy courts have the statutory authority to conduct contempt proceedings. *Placid Refining Company v. Terrebonne Fuel and Lube, Inc. (Matter of Terrebonne Fuel and Lube, Inc.)*, 108 F.3d 609 (5th Cir.1997); *Caldwell v. Unified Capital Corp., (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 284 (9th Cir.1996) ("There can be little doubt that bankruptcy courts have the inherent power to sanction vexatious conduct [under § 105]."); *Hardy v. Internal Revenue Service (In re Hardy)*, 97 F.3d 1384, 1389 (11th Cir.1996)("Section 105 grants statutory powers in the bankruptcy context, stating, '[t]he court may issue any order process, or judgment that is necessary or appropriate to carry out the provisions of this title.' 11 U.S.C. § 105(a)").

■ Beutel has knowingly violated a specific court order to the detriment of Movants. Movants deserve to be compensated for the damages suffered as a result of Beutel's wilful and knowing violation of the injunction.

As such the Court finds Beutel to be individually in contempt of this Court's injunction imposed orally on the record on August 24th and reduced to writing on September 20, 2004. As such, it is appropriate to impose sanctions against Beutel individually in the exact amount he paid out in violation of the injunction-$317,953.53.

Further, sanctions in the same amount shall be assessed against Tommy Thompson solely in his capacity as the current Trustee of the Lazarus Exempt Trust.

The United States, the Chapter 7 Trustee and the FDIC jointly filed the Sanctions Motion. However, judgment will be granted solely to the Chapter 7 Trustee as trustee of the Debtor's bankruptcy estate. The United States and the FDIC are creditors in the Debtor's bankruptcy and will benefit accordingly from the Chapter 7 Trustee's recovery on behalf of the Chapter 7 bankruptcy estate.

### Conclusion

Beutel knowingly violated the specific injunction imposed orally by this Court on August 24, 2004 which was reduced to writing on September 20, 2004 when finally submitted by Beutel's counsel. Movants were injured by his actions. As such, this Court will award sanctions in the form of a judgment against Beutel, individually, and Tommy Thompson as Trustee of the Lazarus Exempt Trust in the amount of $317,953.53 paid by Beutel in violation of this Court's injunction. Liability shall be joint and several. A Judgment of even date herewith shall be entered.