**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 11, 2009

Charles R. Fulbruge III
Clerk

No. 08-50587

In the Matter of: GARY L BRADLEY,

                                        Debtor.

---

RONALD E. INGALLS, Chapter 7 Trustee

                                        Appellee

v.

TOMMY THOMPSON, as Trustee of the Lazarus
Exempt Trust

                                        Appellant.

---

Appeal from the United States District Court
for the Western District of Texas, Austin Division

---

Before BARKSDALE, DENNIS, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Appellant Tommy Thompson, in his capacity as trustee of the Lazarus Exempt Trust, presents this appeal to challenge a ruling of the bankruptcy court, affirmed by the district court, holding Thompson's predecessor Bradley Beutel in contempt of court and imposing monetary sanctions. We conclude that Beutel's conduct in the time period between the district court's announcement of an injunction and its reduction to writing was contemptuous, and accordingly affirm.

## I. Facts and Proceedings

This appeal grows out of the circumstances described in our previous decision in *Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421 (2007), concerning the bankruptcy of Gary Bradley:

> In the mid-1980's, the FDIC obtained a judgment for over $50 million against Bradley, [his business partner James] Gressett, and their large real estate development company, Circle C Development Corp. Gressett filed for Chapter 7 bankruptcy protection in the early 1990's and received a discharge. In 1999, Bradley and Gressett decided to separate their business interests by dividing, transforming, and transferring assets representing Bradley's share into a trust to be formed for the purpose of protecting his assets from creditors. Bradley Beutel, Bradley's cousin and close business associate, was chosen to identify, reconfigure, and transfer assets of values equivalent to Bradley's share into the trust.

*Id*. at 426. In May, 2000, Bradley's sister created the Lazarus Exempt Trust (the "Trust"). She named Beutel—the predecessor to current Appellant Thompson—as trustee.

After substantial assets had been transferred to the Trust, Bradley declared bankruptcy. The bankruptcy court concluded that the Trust was part of a fraudulent scheme:

> For those of us looking in, this is an incredibly fraudulent scheme engaged in primarily by Gary Bradley, the Debtor, Gressett, the Debtor's business partner, and, with the Trust's formation, Bradley Beutel, the Trustee, as well, to hide the assets Bradley owned, to place them into the Trust when formed and to preserve them from the clutches of Bradley's creditors, the FDIC and the IRS.

*See Bradley v. Ingalls (In re Bradley)*, 371 B.R. 782, 785 (2007) (quoting earlier opinion); *see also* 501 F.3d at 427 (detailing the bankruptcy court's more specific findings regarding the Trust). The bankruptcy court denied Bradley discharge from bankruptcy for transferring, removing, destroying, mutilating, or concealing property of the debtor with intent to hinder, delay, or defraud a

creditor, pursuant to 11 U.S.C. § 727(a)(2)(A). It concluded that the Trust was largely "self-settled" under Texas law and was therefore not protected from creditors. *See* 501 F.3d at 427. The bankruptcy court allowed the bankruptcy trustee—current Appellee Ronald E. Ingalls—to recover from the Trust those self-settled assets that he could demonstrably trace from Beutel's possession to the Trust's possession at the time. Some other assets were ruled beyond Ingalls's reach, however, because "although Ingalls had traced [them] from Bradley to the Trust, he had failed to show that those identical assets or products of those assets were still in the Trust; or that they had become commingled with Trust assets." *Id.* at 430. Ingalls, Beutel, and Bradley all appealed aspects of the bankruptcy court's 145-page ruling. The district court affirmed, and we did as well. *See id.* at 426.

The present appeal concerns Beutel's diversion of property from Trust-controlled entities in the time period between the April, 2004 trial on the merits in the bankruptcy court and the issuance of the bankruptcy court's resulting ruling on October 28, 2004. Prior to the trial, the bankruptcy court had enjoined Beutel from "transferring property or money of the Trust to himself" or to entities controlled by him or represented by Bradley's attorney. That injunction expired at the trial's conclusion. At that point, Beutel began making preparations to sell significant Trust assets, particularly real estate belonging to a Trust-controlled entity called Phoenix Holdings, Ltd. This property would later be among the assets held to be self-settled.

In order to prevent Beutel from disposing of the Phoenix Properties or other trust assets, Ingalls, together with the United States and FDIC as creditors, filed a "Joint Motion to Maintain Status Quo Pending Final Ruling in Adversary Proceeding." Beutel did not attend the August 24, 2004 hearing on the motion, where Beutel's attorney admitted there were preparations to dispose of the Phoenix Property. At the hearing, the bankruptcy court informed the

parties it would enter an injunction somewhat narrower than requested, stating that:

> I'm going to enjoin . . . Mr. Beutel as trustee from disposing of any asset owned by any entity in which the trust owns at least 51 percent of the equity or which it controls except that the trustee may sell, through his control of any of those entities, any asset of those entities if the sale is for a fair value and at arm's length and provided further that the consideration therefore be maintained in that entity except for the payment of valid, non-insider claims of those entities and shall not be disbursed to other entities in which the trust owns an interest, to the trustee, to the beneficiary of the trust, [or to entities connected to certain other individuals associated with the debtor].

The bankruptcy court instructed Beutel's counsel to take the lead in drafting a corresponding order.

It took almost a month for the bankruptcy court to enter the order, and in the meantime Beutel effected the sale of Trust assets. On September 7, 2004, counsel for Ingalls submitted a proposed draft injunction to the bankruptcy court.[1] That same day, Beutel closed the sale of the Phoenix Property and other Trust assets. Beginning September 9, 2004, Beutel began to disperse funds received from the sale to various entities controlled by the trust, himself, and Bradley. On September 10, Beutel filed a Motion to Approve Disbursements, seeking permission to make certain transfers contrary to the injunction previously announced.[2] It was not until September 20, 2004, that the bankruptcy court issued its ultimate written injunction, with terms essentially corresponding to those it had announced at the hearing.

---

[1] As noted, the bankruptcy court had assigned Beutel's counsel to draft the order, but counsel explained at oral argument that Ingalls's counsel drafted it instead, with Beutel's counsel's agreement, because Beutel's counsel became too busy.

[2] The bankruptcy court denied this motion, after a hearing, on October 7, 2004.

On motion from Ingalls and the government creditors, the bankruptcy court later held Beutel, personally and in his capacity as trustee, in contempt for transferring Trust property and failing to retain the consideration received in the entities that sold the property. *See Bradley v. Ingalls (In re Bradley)*, 371 B.R. 782, 797 (2007). It concluded that Beutel transferred and diverted sale consideration away from Trust entities later determined to be property of the bankruptcy estate, by various means including the initial structuring of the sale transactions. The contempt process took several years. Ingalls, the FDIC, and the United States initially filed a motion for contempt in October, 2004. Consideration of the motion was delayed while the parties conducted discovery and litigated the appeal of the bankruptcy court's rulings from the trial on the merits. The movants filed a First Amended Joint Motion for Contempt on December 22, 2006. After a trial at which Beutel testified in his own defense, the bankruptcy court granted the motion, leading to this appeal.

The bankruptcy court rejected Beutel's testimony, in which he claimed that he had not known about the injunction until late September when the court issued the final written order. It concluded that Beutel's testimony was "either an error of memory or perjury," *id.* at 787, and leaned toward the latter conclusion:

> This Court does not believe Mr. Beutel's testimony that he knew nothing about the injunction until September 27, 2004 in any manner, shape or form. Mr. Beutel's attempt to use the "ostrich with his head stuck in the sand" defense is not only implausible, it is patently ridiculous. His testimony cannot be believed, and the Court no longer holds any faith in Mr. Beutel's ability or desire to be truthful. He is the epitome of the non-credible witness. And, it is obvious that he chose not to attend the August 24th hearing so he would not have to testify about the pending sale.

*Id.* at 787–88.

The bankruptcy court enumerated other key observations, findings, and conclusions in a list of reasons for holding Beutel in contempt and sanctioning him:

1. This is a civil contempt issue not a criminal contempt issue. No imprisonment is involved.

2. Beutel had actual knowledge of the Court's oral injunction stated on the record August 24, 2004.

3. The August 24, 2004 oral injunction was clear and specific.

4. It was only after the injunction was pronounced on the record that Beutel's counsel disclosed the existence of the pending sale.

5. The remainder of the hearing was devoted primarily to Beutel's counsel clarifying the exact extent of the injunction orally pronounced on the record; approximately one-quarter of the total time of the hearing.

6. The sale in question had been Beutel's primary focus from the end of the trial on the merits—April 30, 2004—until the date of the injunction hearing.

7. Beutel did not come to the hearing—obviously so he could avoid being put on the stand and potentially have to testify about the pending sale.

8. The sale was of a great portion of real estate owned by the Trust through two of its entities and would result in substantial cash being generated which Beutel needed.

9. Beutel believed he was restrained by the oral injunction of August 24th. His September 10, 2004 Motion stated unequivocally the existence of this Court's injunction which required him to obtain this Court's approval for making payments to related entities. *THE ONLY SUCH ORDER IN EXISTENCE AS OF THAT DATE WAS THE ORAL INJUNCTION OF AUGUST 24, 2004.*

10.    Beutel's counsel was to draft the written order. It was a relatively simple order. Yet it was not submitted to this Court for entry until September 20, 2004, approximately four weeks after the August 24, 2004 hearing and two weeks after Beutel's counsel filed a September 10, 2004 Motion to approve disbursements of the remaining sales proceeds. Why was the September 10 Motion filed if Beutel and his counsel did not believe the injunction was in place?[3]

11.    The September 10, 2004 Motion to Approve Certain Transactions and Payments from the sales proceeds is a judicial admission as to the existence of the August 24, 2004 injunction and its validity. Otherwise, there would be no reason for counsel to have filed the Motion.

12.    Beutel's wanton contemptuous behavior should neither be condoned nor encouraged.

13.    Courts should be able to rely upon a party's counsel and their duty to the courts.

*Id.* at 789–90. The bankruptcy court analyzed various aspects of the transaction and determined Beutel had transferred $317,953.53 to related entities in

---

[3]    In an order dated September 27, 2007, the bankruptcy court later withdrew paragraph 10 and replaced it with the following text, reflecting the fact that counsel had filed a proposed injunction on September 7, but that there had apparently been confusion over the filing:

10. Beutel's counsel was to draft the written order as per the instructions of the Court. It was a relatively simple order. Counsel for the Plaintiff prepared the initial draft of the order with Beutel's counsel's consent. It was submitted to this Court for approval on September 7, 2004 by counsel for the Plaintiff with knowledge of counsel for Beutel, approximately two weeks after the August 24, 2004 hearing and just three days prior to Beutel's counsel filing the September 10, 2004 Motion to Approve Disbursements from the remaining sales proceeds. The Order was uploaded by Plaintiff's counsel on September 17, 2004 after receiving the Court's approval. It was signed September 20, 2004 and docketed September 22, 2004. This simply heightens the inquiry, "Why was the September 10 Motion filed if Beutel and his counsel did not believe an injunction was validly in place[?]"

*Id.* at 2–3.

violation of the "oral injunction" and in contempt of court. It declined to order return of those assets because "[m]ovants have failed to name any of these entities as respondents herein or to otherwise pursue them." *Id*. at 797. It held Beutel in contempt, however, and imposed sanctions (1) against Beutel personally and (2) against Thompson as Beutel's successor as trustee, jointly and severally for the entire amount. *Id*. The district court affirmed.

Ingalls subsequently settled with Beutel, personally. Thompson now appeals the contempt order and sanctions in his capacity as trustee. Neither the United States nor the FDIC is a party to the appeal.

## II. STANDARD OF REVIEW

Like the district court, this court reviews a bankruptcy court's findings of fact for clear error, and its legal conclusions de novo. *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),*108 F.3d 609, 613 (5th Cir. 1997). "Where the district court has affirmed the bankruptcy court's factual findings, we will only reverse if left with a firm conviction that error has been committed." *Id*. A bankruptcy court's assessment of monetary sanctions for contempt is reviewed for abuse of discretion. *Id.; see also Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (reviewing contempt finding and damage award for abuse of discretion in non-bankruptcy appeal).

## III. DISCUSSION

Thompson challenges three aspects of the rulings below. Most significantly, he argues that he was under no judicial compulsion prior to issuance of a written injunction, and that he cannot be held in contempt for violation of an "oral injunction." We will consider this argument in some depth. He also argues that the proceedings were confusing and failed to provide adequate notice of the conduct proscribed, and that some of his conduct deemed

contemptuous actually did not violate the bankruptcy court's orders. These arguments are unpersuasive.

## A. Availability of contempt sanctions for violation of an injunction not yet reduced to writing

### 1. Seventh Circuit authority

Thompson's main argument is that "oral pronouncements at the August 24th hearing were not enforceable by contempt until commemorated in a written order that complied with Federal Rule of Civil Procedure 65." He supports this argument by citation to two decisions of the Seventh Circuit, *Bates v. Johnson*, 901 F.2d 1424 (7th Cir. 1990) and *Hispanics United of DuPage County v. Village of Addison*, 248 F.3d 617 (7th Cir. 2001), which stand for the proposition that an injunction not reduced to writing is not a valid, appealable injunction under the Federal Rules of Civil Procedure.[4]

*Bates* concerned a district court that purported to orally prohibit certain actions by the state of Illinois, but refused that state's requests to put the command in writing. 901 F.2d at 1427. The court of appeals stated it was "puzzled by the district judge's unwillingness to put on paper what he said several times in court," and held that an oral ruling, by itself, does not comply with the requirements of Federal Rules of Civil Procedure 65(d) and 58. *Id.* at 1427–28. Rule 65(d) provides in part that "[e]very order granting an injunction and every restraining order" must comply with certain requirements.[5] *Bates* interpreted "order" in this sentence to refer to a written document only, and

---

[4] The relevant civil procedure rules are also applicable in bankruptcy courts pursuant to Federal Rules of Bankruptcy Procedure 7054, 7065, and 9021.

[5] It provides: "Every order granting an injunction and every restraining order must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

therefore concluded that the district court's oral command did not comply with the rule. 901 F.2d at 1427. More importantly, the court noted Rule 58, under which an injunction order must be accompanied by a "judgment . . . set out in a separate document."[6] *See* 901 F.2d at 1428. It invoked Seventh Circuit authority emphasizing that, where a judgment is required, it is the judgment, not the order, that contains the court's decree. *See id.* In light of these requirements, the court considered the raw oral commands of the district court to be a nullity: "A judge who proclaims 'I enjoin you' and does not follow up with an injunction has done nothing." *Id.* at 1427 (citations omitted). "Because the state is not under an enforceable constraint," the court concluded that "there is nothing before us on appeal." *Id.* at 1428.

Similarly in *Hispanics United*, the Seventh Circuit focused on the lack of binding effect and appealability of a court's purported oral modification of a consent decree. The district court had issued several orders under which an "emergency motion for temporary restraining order and for interpretation and enforcement of consent decree" was granted "to the extent allowed in open court." 248 F.3d at 619. The court of appeals considered this no better than the injunction in *Bates* that was never memorialized in writing. *Id.* at 620–21.

Thompson suggests that we must either accept his position or split with these Seventh Circuit cases, but we conclude there is no need for that choice. This case arises in a different context from the Seventh Circuit decisions, and presents different circumstances. *Bates* and *Hispanics United* discussed the inadequacy of oral decrees in determining whether there was a valid, appealable order, not in the context of contempt proceedings. Furthermore, in the present case, in contrast to the district courts in *Bates* and *Hispanics United*, the

---

[6] Rule 58 is applicable to injunctions by virtue of Rule 54(a), which defines "judgment" to include "a decree and any order from which an appeal lies." An appeal lies from an order granting an injunction. 28 U.S.C. 1292(a)(1).

bankruptcy court *did* "follow[] up with an injunction" materially identical to the oral command. In contrast to parties before the Seventh Circuit, Beutel was held in contempt for violating an order he considered to be binding, and which, in any case, would shortly become binding upon him. The bankruptcy court held Beutel in contempt for violating a central, common prohibition in the "oral injunction" and ultimate written injunction—the command to retain the consideration from Trust property sales in the entities whose property was sold, rather than diverting funds to entities potentially unreachable by the bankruptcy trustee. There is no allegation of clear error in the district court's factual finding that Beutel in fact considered himself bound by the "oral injunction," and that he falsely claimed he consummated the subject transactions in ignorance of it. The question we face is not whether the bankruptcy court acted properly to create an effective, appealable order. It is whether Beutel's manifestly improper actions can render him liable for contempt.

### 2. *Contempt analysis*

The first step in the analysis is to determine whether the contempt here was civil or criminal.[7] The bankruptcy court may have associated criminal contempt with imprisonment, when it stated that "[t]his is a civil contempt issue not a criminal contempt issue. No imprisonment is involved." 371 B.R. at 789. That would not be the correct basis for the distinction:

> A contempt order or judgment is characterized as either civil or criminal depending upon its primary purpose. If the purpose of the

---

[7] *See Smith v. Sullivan*, 611 F.2d 1050, 1052 (5th Cir. 1980) ("The first duty of an appellate court in reviewing a contempt judgment is to determine whether the nature of the contempt proceeding was civil or criminal."). Trial courts should, and often do, identify contempt proceedings as criminal or civil at the time they are conducted, and "[a] court's characterization of its proceedings is a factor to be considered in determining the character of a contempt, although it is not conclusive." *Lewis v. S.S. Baune*, 534 F.2d 1115, 1119 (5th Cir. 1976).

> sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.

*Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir. 1990) (internal citations omitted). Imprisonment is an appropriate remedy for either civil or criminal contempt, depending on how it is assessed. If the prison term is conditional and coercive, the character of the contempt is civil; if it is backward-looking and unconditional it is criminal. *See generally Shillitani v. United States*, 384 U.S. 364, 366, 368 (1966) (holding that prison sentence of two years with automatic release upon compliance with court's decree indicated civil contempt). Similarly, a lump sum fine that punishes past conduct is criminal, while a fine that accrues on an ongoing basis in response to noncompliance is civil. *Compare Am. Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523, 527, 530–31 (5th Cir. 1992) (discussing imposition of criminal fine) *with Hunt v. Hunt (In re Hunt)*, 754 F.2d 1290, 1293 (5th Cir. 1985) (discussing imposition of civil fine).

The present case concerns neither punitive criminal contempt nor coercive civil contempt; rather it concerns "compensatory" or "remedial" civil contempt. "Civil contempt can serve two purposes," either coercing compliance with an order or "compensat[ing] a party who has suffered unnecessary injuries or costs because of contemptuous conduct." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961–62 (5th Cir. 1996) (citing *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 400 (5th Cir. 1987)). Like criminal contempt, remedial civil contempt is backward-looking.[8] But remedial contempt is civil, because it remedies the consequences of defiant conduct on an opposing party, rather than punishing the

---

[8] For this reason, remedial civil contempt sanctions can be appropriate even after the underlying litigation has terminated, in contrast to coercive civil contempt, which becomes moot if the underlying proceeding terminates. *See Petroleos Mexicanos*, 826 F.2d at 400.

defiance per se. It accordingly does not require the special safeguards that accompany criminal contempt proceedings, such as establishment of mens rea and proof beyond a reasonable doubt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) (holding that remedial civil contempt does not require proof of criminal intent); *Griffith v. Oles (In re Hipp, Inc.)*, 895 F.2d 1503, 1509 (5th Cir. 1990) (discussing character of criminal contempt as a "crime in the ordinary sense," requiring a presumption of innocence, proof beyond a reasonable doubt, and protection against self-incrimination). The present proceeding is a remedial civil contempt proceeding, because the bankruptcy court held Beutel liable to the bankruptcy estate rather than imposing a fine payable to the court. Accordingly, we must determine if the remedial civil contempt power extends to defiance of a bankruptcy court injunction whose terms are known, but which has not yet been formalized as required by procedural rules.

If this were criminal contempt, we would have little difficulty concluding that the contempt power reaches Beutel's conduct as found by the bankruptcy court. Criminal contempt in the federal courts is governed by 18 U.S.C. § 401, which allows punishment of "[d]isobedience or resistance" to a court's "lawful writ, process, order, rule, decree, or command." Beutel's conduct certainly constitutes willful "resistance" to the court's lawful "command," and arguably falls within other terms of the broadly-worded statute. Consistent with this analysis, we have affirmed criminal contempt sanctions for violation of a bankruptcy court's oral order later reduced to writing. *See In re Hipp, Inc.,* 5 F.3d 109 (5th Cir. 1993). We explained in *Hipp* that the bankruptcy court "orally granted an injunction" prohibiting David Oles from burdening certain disputed property with *lis pendens* filings. *Id.* at 112. The order was reduced to writing and entered approximately one month later. *Id.* The district court found Oles to be in contempt of *the oral order*, which we deemed appropriate. *Id.* at 112 n.4

13

(citing *In re LaMarre*, 494 F.2d 753 (6th Cir. 1974) for the proposition that an "order entered in open court in presence of [the] defendant may be enforced by criminal contempt"). Oles argued that the oral order did not explicitly prohibit his conduct, pointing to the written order which was more specific, but we concluded the oral order was clear enough to provide notice of the proscribed conduct and subject him to contempt sanctions. *Id.* at 112–13.

Our precedents regarding remedial civil contempt do not appear to have addressed the question. We have often stated that the elements of civil contempt are "(1) that a court order was *in effect*, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *E.g.*, *Fed. Deposit Ins. Corp. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995) (emphasis added) (citing *Martin v. Trinity Indus.* 959 F.2d 45, 47 (5th Cir. 1992)). But this formulation does not reflect any holding that civil compensatory contempt is unavailable in a circumstance like the one that confronts us here. The language is ultimately derived from the statement of the Supreme Court in *McComb v. Jacksonville Paper Co.* that "[c]ivil . . . contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance."[9] Like our cases, *McComb* discusses civil contempt in the context of violation of a formal order of the court, but it does not address the question whether civil contempt is also available for a knowing violation of an oral order before it is reduced to writing.

We therefore turn to the nature of the contempt power. "It is settled law that the power to punish for contempt is an inherent power of the federal courts and that it includes the power to punish violations of their own orders." *U.S. v. Fidanian*, 465 F.2d 755, 757 (5th Cir. 1972) (citations omitted). The Supreme

---

[9] 336 U.S. 187, 191 (1949). *See Martin*, 959 F.2d at 47 (citing *Petroleos Mexicanos,* 826 F.2d at 401); *Petroleos Mexicanos,* 826 F.2d at 401 (citing *McComb*).

Court described the nature and necessity of the power in *Gompers v. Buck's Stove & Range Co.*:

> [W]hile it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory.
>
> If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.
>
> This power has been uniformly held to be necessary to the protection of the court from insults and oppression while in the ordinary exercise of its duty, and to enable it to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of citizens.

221 U.S. 418, 450 (1911).

While the criminal contempt power is limited by 18 U.S.C. § 401, civil contempt remains a creature of inherent power. *See Spallone v. United States*, 493 U.S. 265, 276 (1990) (referring to "the axiom that courts have inherent power to enforce compliance with their lawful orders through civil contempt.'" (internal quotation marks omitted)); *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990) ("[F]ederal courts have inherent power to police themselves by civil contempt, imposition of fines, the awarding of costs and the shifting of fees."). In *McComb*, the Court described civil contempt in broad terms, encompassing sanctions that prevent "experimentation with disobedience of the law," and remedial powers "determined by the requirements of full remedial relief," as necessary "to effect compliance with [the court's] decree." 336 U.S. at 192, 193 (citations omitted); *see also Spallone,* 493

U.S. at 276 (referring to the inherent contempt power as a "basis for the exercise of broad equitable powers"); *United States v. Alcoa*, 533 F.3d 278, 286–87 (5th Cir. 2008) ("[D]istrict courts have wide discretion to enforce decrees and to implement remedies for decree violations. . . . Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt.").

We see no reason why the civil contempt power, as generally recognized in our courts, should not reach Beutel's conduct. As discussed above, the power is broad and pragmatic, reaching where it must—consistent with prudent court management and due process—to prevent insults, oppression, and experimentation with disobedience of the law. Beutel's shell game with the proceeds of Trust property is the type of conduct contempt targets, and there is no doubt that he received adequate notice and opportunity to be heard at all stages of the proceedings. His conduct had the effect of frustrating not only the injunction, but also the trial on the merits, by diverting funds from Trust entities that the bankruptcy court would later rule belonged to the bankruptcy estate. The district court found—not clearly erroneously—that Beutel intentionally avoided the injunction hearing because he intended to sell Trust assets and distribute the proceeds in a manner that he expected the court to prohibit. On top of this, the bankruptcy court provided clear notice of the commands that Beutel violated, and which the bankruptcy court later reduced to writing and entered. The bankruptcy court found—also not clearly erroneously—that Beutel knew about the "oral injunction" and considered himself bound. Nonetheless he consummated the transaction as planned and then falsely claimed he had not known about the court's command. With proper procedures, this conduct could support a criminal contempt conviction. Thompson provides no reason why the result should be different merely because the contempt finding made Beutel liable to the opposing party rather than imposing a fine payable to the court. We

16

hold that the civil contempt power reaches Beutel's conduct despite the fact that it occurred before the written injunction was in force.

The context of the contempt proceedings in bankruptcy court provides further grounds to hold Beutel's conduct subject to remedial civil contempt sanctions. Bankruptcy courts are not Article III courts; therefore they do not necessarily possess the inherent powers of such courts. We have held that bankruptcy courts lack criminal contempt power, at least regarding conduct occurring outside the presence of the court, and must present such matters to the district court for a criminal trial on the merits. *Griffith v. Oles (In re Hipp, Inc.)*, 895 F.2d 1503, 1521 (5th Cir. 1990). It is widely recognized, however, that they do possess civil contempt power, though there is divided authority as to its source. In *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir. 1997), we joined the circuits holding that the source is statutory, based on 11 U.S.C. § 105. *Id.* at 613. Section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

We held in *Placid Refining* that "an order . . . which compensates the debtor for damages suffered as a result of a creditor's violation of a post-confirmation injunction under 11 U.S.C. § 1141, was both necessary and appropriate to carry out the provisions of the bankruptcy code." 108 F.3d at 613. The same is true of the contempt order in this case. Bankruptcy proceedings are particularly vulnerable to efforts—which can be nearly instantaneous—to transfer funds out of the reach of parties entitled to claim them. Injunctions against moving assets

are important to the management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect. In the present circumstances, we consider a contempt order restoring diverted property to be necessary and appropriate to implement the bankruptcy court's ultimate injunction, and to prevent abuse of process.[10]

## B.    Further arguments

Beutel's further arguments are of no avail. He contends that the proceedings were confusing, and as a result that the bankruptcy court's rulings were vague and indefinite, failing to provide guidance for his conduct. He argues:

> To begin with, the parties did not even agree if the First Amended Joint Motion was simply a motion to continue the existing, limited injunction that had been entered on January 12, 2004, or was a request for [sic] new and expanded injunction that would essentially freeze all of the Trust's assets. When the injunction hearing was finally held, no testimony or evidence was taken to support the movants' nebulous claims. When it finally attempted to rule on the motion, the Bankruptcy Court began its rulings on page 30 of the transcript of the August 24, 2004 hearing, attempted to clearly describe the injunction order on page 37, "started over," with a new explanation on page 38, and then spent another 10 pages in the transcript going over details and discussing who would prepare the injunction order and what exactly it needed to contain.

Thompson further complains about the delay in entering the ultimate written order, which he alleges created confusion. These arguments do not gainsay the simple fact that when Beutel committed the acts resulting in contempt, he knew what he was prohibited from doing (alienating Trust assets and failing to retain

---

[10] Our holding should not be read to encourage use of "oral injunctions" in bankruptcy proceedings or otherwise. The bankruptcy court emphasized the simplicity of the command when it sanctioned Beutel. For the same reason, the injunction may have been a poor candidate to be assigned to the parties for drafting. A court facing a similar situation may wish to expeditiously draft the order itself and promptly enter an appropriate judgment.

the consideration received in the appropriate entities) and did it anyway. Obviously, a lack of agreement between opposing parties briefing a motion for injunction does not render the resulting ruling unclear. Likewise, any lack of testimony or evidence (beyond the extensive evidence heard at the trial) has no bearing on the clarity and definiteness of the resulting instruction. Similarly, a trial court's effort to precisely rephrase an order when dissatisfied with an initial formulation is indicative of clarity, not confusion. The same is often true for discussions clarifying what parties can and cannot do. In any case, Thompson fails to cite specific language suggesting he received contradictory instructions or that the court meant to allow the conduct it later found to be contemptuous. We reject the argument that the bankruptcy court failed to provide Beutel with clear instructions covering the conduct that led to the contempt finding.

Thompson also argues that certain aspects of his conduct that the bankruptcy court deemed contemptuous in fact were not. His first argument concerns allocation of closing costs for the Phoenix Holdings property sale discussed above. This involved selling a large amount of Phoenix Holdings acreage, together with acreage belonging to another Trust entity, Lazarus Investments, L.P., to a third-party buyer. The total proceeds were $6,557,342.15, which were paid to Phoenix Holdings on September 7, 2004. Then, on September 9, 2004, Beutel directed Phoenix Holdings to transfer $2,405,169 to Lazarus Investments, allocating the net proceeds between Phoenix Holdings and Lazarus Investments based on the proportion of acres they contributed to the sale.

The bankruptcy court held Beutel in contempt for failing to also allocate the closing costs pro rata. Though it split proceeds with Lazarus Investments, Phoenix Holdings bore all closing costs before net proceeds were calculated. The bankruptcy court labeled this a "resort to trickery," and concluded it was a

proscribed "transfer," because it resulted in "$160,639.70 that should have been in Phoenix Holdings' bank account end[ing] up in Lazarus Investments' bank account."[11]

Thompson argues that the only evidence regarding the closing costs is Beutel's testimony that he allocated them to Phoenix Holdings because the properties sold had "vastly different acquisition costs."[12] Thompson contends that in the absence of contrary testimony, the district court had to credit Beutel and defer to his business judgment.

We disagree. Beutel's testimony is vague as to why Lazarus Investments "maybe" deserved better-than-proportional proceeds, and it provides no evidence that the closing costs were a proper offset for any such discrepancy. At best, Beutel's testimony indicates that he allocated costs haphazardly, despite a court command that constrained his discretion in very specific ways. The bankruptcy court concluded that Beutel was "the epitome of the non-credible witness." After an extensive trial on the merits and multiple hearings, it was free to disbelieve

_____

[11] Thompson argues that allocating closing costs to Phoenix Holdings was not a "transfer" from Phoenix Holdings to Lazarus Investments. This is beside the point. The injunction language did not merely bar "transfers." It required that the consideration for a property sale like this "be maintained in that [selling] entity except for the payment of valid, non-insider claims." The bankruptcy court concluded that disbursing to Lazarus its pro rata share of consideration did not violate the injunction, as long as there was a set-off for Lazarus's pro rata share of closing costs. It accordingly found that the transfer of $2,405,169 was $160,639.70 too much. The word "transfer" is appropriate to describe this misdeed.

[12] Beutel's explanation for allocating proceeds pro rata, but costs entirely to a particular entity likely to be deemed property of the bankruptcy estate was as follows:

> Well, there was a lot of different ways I could have done that. Believe it or not, but I was trying to be as simple as possible and be as fair as possible. The two properties have vastly different acquisition costs. . . . [T]he acquisition costs were much higher for Lazarus Investments and so I kind of felt like I did even—I didn't give Lazarus Investments all that they maybe should have received for their property and so in an effort to make it a bit fairer I let Phoenix take the closing costs. And I'm still not sure that Lazarus Investments got everything that they should but I thought that was an easier way to account for it.

his testimony to the extent it presented any evidence of a rationale for assigning all closing costs to Phoenix Holdings.[13]

Thompson also argues the bankruptcy court should not have treated earnest money received for Phoenix Property sale as proceeds of the sale until it closed, because this money irrevocably belonged to Phoenix Holdings even if the sale did not close. Therefore he proposes that it did not constitute sale proceeds and could be disposed of with impunity at any point prior to sale. Among several possible grounds to reject this argument, we note that the bankruptcy court's operative language does not refer to "sales proceeds." It directs that "the consideration" from a sale of a Trust entity's assets must "be maintained in that entity" and not be dispersed to insiders. Whether or not the earnest money constituted proceeds, it was certainly part of the consideration for the sale. Dispersing it would have the effect of depriving the affected Trust entity of funds related to the sale, directly implicating the concerns that motivated the court's ruling. Thus, dispersing earnest money prior to closing violated both the letter and the spirit of that ruling, placing it well within the bankruptcy court's discretion to include these funds in the sanction calculation.

Thompson's last argument concerns a management fee that Beutel paid to himself from Trust assets. On September 9, 2004, Phoenix Holding paid $75,000 to Beutel Capital Management for what Thompson claims were "management fees that Phoenix owed to that entity." The bankruptcy court concluded that $73,834.33 of this amount was paid out of proceeds from the sale

---

[13] Thompson also argues the bankruptcy court calculated the amount of closing costs attributable to Lazarus Investments in an arbitrary manner. This argument does not establish that the bankruptcy court clearly erred in its calculation, or that it abused its discretion in basing the contempt sanction on that figure. The court applied the same criterion, proportionality by acreage, that Beutel applied in allocating the proceeds of the transaction. This is the most plausible figure deducible from the record.

of Phoenix Holdings property after the injunction hearing. It held Beutel in contempt and applied sanctions for that amount.

Thompson argues that "a prior order of the Bankruptcy Court specifically authorized this payment." A prior order indeed authorized Beutel to have Phoenix Holdings "pay a management fee to Beutel Capital Management for the period of March 2004 and thereafter." Therefore, according to Thompson,

> when Phoenix paid the $75,000 to Beutel Capital Management, there were two orders in place: one written order that explicitly allowed payment of management fees to Beutel Capital Management without any restriction, and one oral ruling that more generally limited the distribution of sale proceeds of Phoenix property without any specific reference to Beutel Capital Management.

Thompson proposes, by analogy to statutory construction, that the "specific" older order ought to control the "general" newer one. He also argues that the juxtaposition of the two orders rendered the court's instructions contradictory, such that they cannot support a contempt order.

The two orders are not inconsistent. The first authorizes the management fee, while the second carves out a class of funds from which payment cannot come. The net ruling is that Phoenix Holdings could pay the management fee, but not out of the proceeds of sales taking place after the injunction hearing. Beutel's management company was of course an insider. He could not think the payment fell outside the bankruptcy court's prohibitions except by willful misconstruction. The bankruptcy court was within its discretion to include this payment in its contempt calculations.

## IV. CONCLUSION

For the foregoing reasons, the district court correctly ruled that the bankruptcy court was within its discretion to hold Beutel, as trustee, in contempt, and to impose compensatory sanctions. AFFIRMED.

22