# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 1, 2024

Lyle W. Cayce
Clerk

————————

No. 22-10889

————————

IN THE MATTER OF HIGHLAND CAPITAL MANAGEMENT, L.P.,

*Debtor*,

_____

JAMES DONDERO, DEFENDANT IN THE ABOVE CAPTIONED ADVERSARY PROCEEDING and A CREDITOR, INDIRECT EQUITY HOLDER, and PARTY IN INTEREST IN THE ABOVE-CAPTIONED BANKRUPTCY CASE,

*Appellant*,

*versus*

HIGHLAND CAPITAL MANAGEMENT, L.P., PLAINTIFF IN THE ABOVE-CAPTIONED ADVERSARY PROCEEDING and THE DEBTOR IN THE ABOVE-CAPTIONED BANKRUPTCY CASE,

*Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-1590

_____

Before SMITH, SOUTHWICK, and HIGGINSON, *Circuit Judges*.

No. 22-10889

Leslie H. Southwick, *Circuit Judge*:

James Dondero appeals the contempt order entered against him by the bankruptcy court. Dondero is a co-founder and former CEO of Highland Capital Management, L.P., a global investment advisor that filed for bankruptcy in 2019. Highland filed an adversary proceeding against Dondero because of a dispute over Highland's disposition of its assets in bankruptcy. In the course of that adversary proceeding, the bankruptcy court entered a temporary restraining order against Dondero. That court later found Dondero in contempt of that order and awarded compensatory damages to Highland. The district court affirmed. So do we.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2019, Highland filed a petition for Chapter 11 bankruptcy. To avoid appointment of a Chapter 11 Trustee, an agreement was reached among Highland, Dondero, and the Official Unsecured Creditors Committee (the "Committee") to overhaul Highland's governance structure. Pursuant to this settlement, three independent directors (the "Independent Board") were appointed to govern Highland. One of the directors, James Seery, was appointed as Highland's new Chief Executive Officer and Chief Restructuring Officer. Additionally, Dondero resigned as Chief Executive Officer but remained as an unpaid employee of Highland, working as a portfolio manager for separate non-Highland entities whose funds are managed by Highland. Tensions arose between Dondero and the Independent Board regarding the appropriate path of Highland's wind-down. The Independent Board demanded his resignation, and Dondero complied on October 9, 2020.

Highland's organizational structure encompasses up to 2,000 other investment entities ("related entities"). Although most are neither in bankruptcy nor subsidiaries of Highland, they share various service

2

agreements with Highland.  Through these agreements, Highland (with its own employees and property) has provided resources such as fund managers, legal and accounting services, information technology support, office space, and other overhead for the related entities.  The bankruptcy court observed that many of these related entities "appear to be under the *de facto* control of Mr. Dondero," who acts as the president and portfolio manager for many of them.  Even after his resignation, Dondero continued managing these affiliates, most notably NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. (collectively, the "Advisors").[1]

On December 7, 2020, Highland moved for a temporary restraining order ("TRO") and preliminary injunction against Dondero in response to alleged interference with Highland's operations.  In support, Highland offered evidence that Dondero had instructed Highland employees not to carry out the planned sale of securities owned by Highland.

Three days later, the bankruptcy court granted the TRO following a hearing.  Section 2 of the TRO enjoined Dondero from the following, labeling it the "Prohibited Conduct":

> (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication;

---

[1] In the bankruptcy court's view, much of this litigation stems from the diverging interests of Highland and the Dondero-controlled Advisors.  Highland sought, on various occasions, to liquidate its assets and make payments to creditors; the Advisors had equity interests in many of those assets.  Dondero claimed that Seery, the Highland Chief Executive Officer, was being "vindictive" toward him in trying to make these sales at inopportune times and prices.

(b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents;

(c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero [(the "Shared Services Exception")];

(d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and

(e) otherwise violating [S]ection 362(a) of the Bankruptcy Code.

Section 3 of the TRO enjoined Dondero from "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity from acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct."

On January 7, 2021, Highland moved for an order requiring Dondero to show cause why he should not be held in civil contempt for violating the TRO. Highland alleged that the violations included Dondero's communicating with members of Highland's legal team to coordinate Dondero's legal strategy against Highland and interfering with Highland's intended sales of its assets. Dondero participated in a deposition on January 5, 2021, and a hearing on January 8, 2021, in connection with these matters.

The bankruptcy court held an evidentiary hearing on Highland's contempt motion in late March 2021 (the "contempt hearing"). The court heard testimony from Dondero and Seery (the Highland Chief Executive Officer), and admitted various documentary evidence, as discussed in greater

detail below. On June 7, 2021, the bankruptcy court issued an order finding Dondero in civil contempt (the "contempt order") for communicating with Highland's employees outside of the Shared Services Exception and for interfering with Highland's trading activities. The bankruptcy court imposed a $450,000 compensatory monetary sanction to be paid to Highland, as well as a $100,000 sanction "for each level of rehearing, appeal, or petition for *certiorari*" unsuccessfully pursued. The district court affirmed all aspects of the bankruptcy court's contempt order except for the $100,000 sanction for unsuccessful appeals, which Highland did not contest. Dondero appealed to this court.

## DISCUSSION

This court reviews contempt findings for an abuse of discretion. *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013). Under such a review, this court, like the district court, "reviews a bankruptcy court's findings of fact for clear error, and its legal conclusions *de novo*." *Ingalls v. Thompson* (*In re Bradley*), 588 F.3d 254, 261 (5th Cir. 2009). The interpretation of the scope of an injunction or a TRO is a legal question that this court reviews *de novo*. *Hornbeck Offshore*, 713 F.3d at 792. Where, as here, "the district court has affirmed the bankruptcy court's factual findings, we will only reverse if left with a firm conviction that error has been committed." *In re Bradley*, 588 F.3d at 261 (quoting *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc.* (*In re Terrebonne Fuel & Lube, Inc.*), 108 F.3d 609, 613 (5th Cir. 1997)).

This court also reviews a bankruptcy court's assessment of monetary sanctions for contempt for an abuse of discretion. *Id.* Reviewing courts afford "substantial deference" to such assessments. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 110 (2017).

5

No. 22-10889

Dondero asserts the bankruptcy court erred in three distinct ways. First, he argues the bankruptcy court's TRO failed to satisfy the specificity requirements of Federal Rule of Civil Procedure 65(d)(1). Second, he argues the bankruptcy court erred in determining there was clear and convincing evidence that he violated the TRO such that a contempt finding was appropriate. Third, he argues the bankruptcy court erred in awarding a $450,000 sanction. We address the arguments in that order.

## I.    *The TRO and Rule 65(d)(1)*

Federal Rule of Civil Procedure 65(d)(1) mandates that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required." The purpose of the rule is to "prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Scott v. Schedler*, 826 F.3d 207, 212 (5th Cir. 2016) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

Section 2(c) of the TRO, which is the "Shared Services Exception" provision at issue here, enjoins Dondero from "communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." Dondero contends Section 2(c) violates Rule 65(d)(1)(C)'s prohibition on referencing outside documents. Even if this were not so, he argues, then it would be impermissibly vague because no definite meaning could be attached to the Shared Services Exception without such reference.

We first reject the contention that Section 2(c) references outside documents. Section 2(c) addresses the "services currently provided" —

which is to say the services themselves — rather than the documents that may govern the provision of those services.

We also reject Dondero's related assertion that TRO Section 2(c) is "hopelessly vague and ambiguous." Although the parties cite various precedents of this court in attacking or defending Section 2(c), most instructive is the text of the governing Rule. Rule 65(d)(1)(C) only requires that an injunction or restraining order use "reasonable detail" in describing the conduct required or prohibited. Given the context in which it was entered, Section 2(c) uses reasonable detail in distinguishing permissible conduct from prohibited conduct. As the bankruptcy court stated, although the full scope of Highland's organizational structure was unclear, it might encompass up to 2,000 related entities. This complexity makes a higher level of detail impractical, especially given the danger of easy evasion were the terms crafted more narrowly.

Although not necessary to our holding, this court has deemed it relevant that a party could have, but did not, seek district court clarification: "If for some reason [the defendant] had doubts about the meaning of any part of the injunction, it could have sought district court clarification." *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir. 1969) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949)). The TRO is an equitable remedy; it would be inequitable for us to reward this belated attack on the TRO's clarity.

Section 2(c) did not violate Federal Rule of Civil Procedure 65(d)(1).

## II.    *The evidence of TRO violations*

A court properly finds a party in civil contempt when it is shown, by clear and convincing evidence: "1) that a court order was in effect; 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus.,*

*Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). Willfulness on the part of the contemnor is not required.[2] *Id.*

The bankruptcy court entered the TRO on December 10, 2020; it later concluded that Dondero violated both Section 2(c) and Section 3 of the TRO. Dondero argues there was not clear and convincing evidence of an unambiguous violation of the TRO. Although there must be clear and convincing evidence of a TRO violation to support a contempt finding, *see American Airlines*, 228 F.3d at 581, we review the bankruptcy court's determination that such evidence exists only for an abuse of discretion, *Hornbeck Offshore*, 713 F.3d at 792. We now engage in that review.

### a.    *Evidence of violations of TRO Section 2(c)*

To repeat, Section 2(c) of the TRO issued on December 10, 2020, prohibited Dondero from "communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." The bankruptcy court cited the following post-TRO conduct as evidence that Dondero violated Section 2(c):

On December 15, 2020, Dondero emailed Highland's own in-house counsel Scott Ellington as well as two of his attorneys, stating: "Give him

---

[2] In a related case, this court recently reversed what it concluded was effectively a *criminal* contempt sanction against Dondero, a sanction a bankruptcy court may not impose. *In re Highland Cap. Mgmt., L.P.*, 98 F.4th 170, 176 (5th Cir. 2024). Our finding was based on the bankruptcy court's requiring Dondero to reimburse Highland for its substantial attorneys' fees in litigating the contempt motion; the error was that those fees were incurred as a result of a lengthy evidentiary hearing the bankruptcy court conducted to determine Dondero's intent in violating the court's order. *Id.* at 173, 176. Intent does not matter except for criminal contempt sanctions, and the bankruptcy court erred in conducting a lengthy hearing on intent when it did not have authority to impose criminal contempt sanctions. *Id.* at 176–77. No such error exists in the proceedings before us.

evidence of Seery ineptitude . . . and he will run with it." Seery in question is presumably James Seery, Highland's CEO. The intended recipient of this evidence is someone by the name of "Clubok."

On December 24, 2020, Dondero forwarded three email chains to Ellington. In one, Dondero typed "Fyi" and forwarded an email stating: "Holy bananas . . . make sure we object." (ellipsis in original). Within that forwarded email were also details of a settlement between Highland and HarbourVest, one of Highland's creditors.

The second email chain included reference to "the Temporary Restraining Order that the Court recently entered." Dondero told Ellington, "Who knows how [Bankruptcy Judge] Jernigan reacts but they are not correct re the inappropriateness of Seery activities."

The third email chain included (1) discovery requests from Highland demanding Dondero turn over his Highland-furnished cell phone, and (2) a statement by Dondero's attorney that the cell phone contained privileged materials and "must be protected."

At the March 22, 2021, hearing, Dondero acknowledged that he communicated with "Scott Ellington, as my settlement counsel, or as the go-between with Seery and with creditors, [because it] was an important piece of trying to get something done." In particular, Dondero defended forwarding to Ellington the email about his intent to object to the settlement between Highland and HarbourVest on the grounds that he was "relying on Ellington's role as settlement counsel." The bankruptcy court rejected this explanation, stating it would never have approved that role for Ellington. The bankruptcy court also credited Seery's testimony that he had never consented to Ellington acting as a go-between.

The bankruptcy court did not err in concluding that Dondero was communicating with Highland's own in-house counsel to improve his

litigation posture *against Highland*. Whatever the outer boundaries of the conduct permitted by the Shared Services Exception may be, they did not encompass these bad-faith efforts by Dondero and Ellington. A "court is entitled to a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order." *Hornbeck Offshore*, 713 F.3d at 792. Solidifying the conclusion that these communications had nothing to do with shared services, and that Dondero understood them to be wrong, is Dondero's untruthful explanation that Ellington was serving as "settlement counsel." The bankruptcy court possessed sufficient evidence to conclude that Dondero violated Section 2(c) of the TRO.

### b. *Evidence of violations of TRO Section 3*

TRO Section 3 enjoined Dondero from "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity from acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct." As relevant here, Prohibited Conduct included the restrictions within TRO Section 2(d), which forbade "interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan."

The bankruptcy court cited two admissions by Dondero of post-TRO misconduct. The first admission is found within Dondero's January 5, 2021, deposition, during which the following exchange occurred.

> Counsel for Highland: Okay. So but it's true, then, that you instructed employees of NPA and HCMFA [(Dondero-controlled affiliates of Highland)] on or around December 22nd to stop doing the trades of Avaya and Sky [stocks], correct?

Dondero: Yes

The second admission is found within the March 22, 2021, contempt hearing. There, counsel for Highland stated and asked the following:

> Were you asked these questions and did you give these answers? Question, "And you personally instructed, on or about December 22, 2020, employees of the Advisors to stop doing the trades that Mr. Seery had authorized with respect to SKY and AVYA. Right?" Answer, "Yeah. Maybe we're splitting hairs here, but I instructed them not to trade them. I never gave instructions to settle trades that occurred, but that's a different ball of wax." "Okay." Question, "But you did instruct them not to execute trades that had not yet been made. Right?" Answer, "Yeah. Trades that I thought were inappropriate for no business purpose, I — I told them not to execute."

At this portion of the March 22 hearing, counsel for Highland was impeaching Dondero with his *other* admission of post-TRO interference, this time from a hearing on January 8, 2021.

We hold the bankruptcy court did not abuse its discretion in concluding that clear and convincing evidence existed that Dondero violated both Section 2(c) and Section 3 of the TRO. Either would be sufficient to support the contempt finding; both are satisfied.

III.    *The evidence supporting the $450,000 sanction*

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Haeger*, 581 U.S. at 107 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). Among these powers is the ability to sanction "conduct which abuses the judicial process." *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)). Ordering one party to

reimburse the legal fees of the other is a permissible sanction. *Id.* Such an order must be compensatory instead of punitive. *Id.* at 108.

The bankruptcy court relied primarily on invoices submitted by Highland's counsel to determine the appropriate sanction. These invoices detail (1) the items on which counsel worked; (2) the dates on which they worked on those matters; (3) the amount of time they worked on particular matters; and (4) the applicable billable rates for each entry. Although Highland sought a contempt finding on six different grounds, the court ultimately agreed with only two of those theories. The entries within the invoices do not distinguish between the different theories on which counsel worked, and the court did not distinguish between time spent on successful versus unsuccessful theories in making its award.

The bankruptcy court "reviewed the December invoice [totaling $526,686] and conservatively estimate[d] that $170,919 of the fees reflected in the December invoice related to the TRO and Contempt Motion." The court noted that portions of the December fees "appeared to relate to other litigation matters such as the HarbourVest settlement, Pat Daugherty issues, UBS, demand note litigation, and Dugaboy claims." The court carried out an identical analysis of the January 2021 invoice and "conservatively" concluded that $195,002 of the $698,770 total fees were related to the TRO and contempt motion. Together, the court awarded $365,921 for December and January based on these invoices.

The bankruptcy court also estimated, "us[ing] conservative math," that Highland's primary counsel spent 20 hours in court and preparing for the two-day contempt hearing in March. The court estimated that primary counsel's paralegal also spent 20 hours on the case. Using the hourly rate for each person, the court calculated a fee of $33,400.

The overall total was $399,321.  The bankruptcy court then increased the amount to $450,000.  It justified the increase on the grounds that (1) local counsel also worked on the matter, but their invoices were not submitted; (2) the bankruptcy estate also compensated counsel for the Committee, because those attorneys monitored the litigation though they did not submit invoices; and (3) the bankruptcy estate also paid "the various depositions and transcripts required as a result of this litigation [that] resulted in many thousands of dollars of additional expenses."  The bankruptcy court stated that it had considered the probable effectiveness of the sanction, Dondero's financial resources and the burden of the sanction, and his willfulness in disregarding the TRO.

Dondero finds three errors in this award.  First, the bankruptcy court described its sanction as "relating to the TRO and Contempt Motion," suggesting to him that all fees regarding the TRO were awarded, rather than only those incurred after its entry.  Similarly, Dondero complains the attorneys' December and January invoices included line items that predate entry of the TRO.  Dondero concludes that the bankruptcy court awarded fees based on counsel's work relating to the entry of the TRO.  We do not see these minor factual issues to support error.  The bankruptcy court was clear about the award's purpose: "to compensate [Highland] for loss and expense *resulting from Mr. Dondero's non-compliance with the TRO*."  We are not convinced that its "conservative[] estimates" of the fees "relating to the TRO and Contempt Motion" awarded sanctions for work done before entry of the TRO.

Second, Dondero argues the bankruptcy court needed to distinguish between the successful and unsuccessful grounds for the contempt motion asserted by Highland.  It is true the Supreme Court has instructed that a party "may recover only the portion of his fees that he would not have paid but for the misconduct."  *Haeger*, 581 U.S. at 109 (quotation marks and citations

omitted). What *Haeger* requires is "that a district [or a bankruptcy] court assess and allocate specific litigation expenses — yet still allows it to exercise discretion and judgment." *Id.* The rule is flexible enough that a court may use estimates or decide that an entire category of expenses was incurred solely because of the misconduct at issue. *Id.* at 110. Here, the bankruptcy court explained that the contempt motion arose in the context of Dondero's potentially costly interference with Highland's reorganization plan. Highland did not "incur[] any quantifiable damage other than significant attorneys' fees," however, because "counsel acted quickly in bringing the Contempt Motion before much damage could be done." The bankruptcy court accordingly did not err in granting all fees for work done to protect the reorganization plan from Dondero's interference, without regard to which grounds for contempt ultimately proved successful.

Finally, Dondero contends that Highland provided insufficient evidence to support the fee amounts. The evidence included the (1) hours expended, (2) corresponding billable rates, and (3) corresponding descriptions of the work performed. This was not "so vague or incomplete that the district court was precluded from conducting a meaningful review of whether the hours claimed on this litigation were reasonably expended." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 823 (5th Cir. 1997). We likewise cannot accept the related argument that the bankruptcy court erred in awarding approximately $50,000 to offset the costs of Highland's local counsel, the Committee's counsel, and the depositions and transcripts required. The court was permitted to use estimates given its "superior understanding of the litigation." *Haeger*, 581 U.S. at 110 (citation omitted).

Undergirding our analysis of the sanctions award here is a recognition of the goal of such awards everywhere: "to do rough justice." *Id.* (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). Complete accuracy is neither required

No. 22-10889

nor expected.    The bankruptcy court's judgments in these matters are entitled to our "substantial deference." *Id.*

AFFIRMED.